IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 12-572 |
| ALEXANDRE ASTAKHOV | : | |

### GOVERNMENT'S TRIAL BRIEF

The United States of America, by its attorneys, Zane David Memeger, United States Attorney for the Eastern District of Pennsylvania, and Robert J. Livermore, Assistant United States Attorney, hereby submits this trial brief.

**I.      Introduction**

ALEXANDRE ASTAKHOV has been charged in a two count indictment with (1) conspiracy to violate the Arms Export Control Act and (2) an attempt to violate the Arms Export Control Act for attempting to illegally export L-3 CNVD-T thermal clip-on night vision devices, L-3 mini thermal monoculars (MTMs), and an OASYS SkeetIR thermal weapon sight.   Trial is scheduled to begin on January 27, 2014 before the Honorable Gene E.K. Pratter.

**II.     Facts**

In May 2011, co-conspirator Yakov Shvartsovskiy, a/k/a "Steve", using the e-mail account steve.huni@yahoo.com, sent an e-mail to an internet vendor of night vision devices inquiring about purchasing a CNVD-T, a thermal clip-on rifle sight which is on the USML.   Shvartsovskiy told the vendor that he was referred by Igor Bobel.[2]   Bobel had previously purchased large

---

[2]      At the time, Bobel was under investigation for AECA violations.   On May 16, 2011, Bobel tried to export three night vision devices (one Insight CNVD T-2 thermal weapons sight and two Night Force rifle scopes) via an Aeroflot flight from JFK to Russia.   Bobel was arrested on

amounts of night vision devices from the vendor. Shvartsovskiy stated that he would purchase this device for $20,995 and that he needed it quickly. Shvartsovskiy noted he would pay an extra $100 for overnight shipping. On May 14, 2011, Shvartsovskiy wire transferred the money to the vendor to purchase the item.[3] On May 16, 2011, the vendor e-mailed Shvartsovskiy an ITAR compliance form. Shvartsovskiy completed the form and signed it in the name of Aleksandr Kostin.

Over the next several weeks, Shvartsovskiy and his associates using the steve.huni@yahoo.com account, purchased a number of other devices from internet vendors. Shvartsovskiy and his associates also completed export compliance forms under the names "Alex Kostin" and "Frederick Gauthier" in an attempt to disguise their true identities. This action also indicated their knowledge that these devices could not be exported without a license.

In March 2012, Shvartsovskiy was referred by a mutual business associate to an HSI cooperating defendant, Yahor Osin, who was using the alias "Denis Egorov". Egorov portrayed himself as an arms broker with ready access to large quantities of high-tech military hardware. Shvartsovskiy, using the alias "Steve", then had a series of phone conversations with Egorov. As

---

June 30, 2011. Bobel told the investigators that he was working for Shvartsovskiy. Over the preceding 6 months, Bobel purchased at least 20 other night vision devices valued at over $85,000 which he illegally exported to Russia.

[3] Shvartsovskiy instructed the vendor to ship the item to Aleksandr Kostin, 2278 West Street, Apartment 2nd Floor, Brooklyn, New York 11223. Aleksandr Kostin was a real person who came to the United States on December 11, 2009, on a J-1 visa, opened some bank accounts, and then returned to Russia on May 30, 2011. According to Kostin's sister, Svetlana Shirokova, Kostin was a friend of Shvartsovskiy. Shirokova stated that when Kostin returned to Russia, Shvartsovskiy gained possession of Kostin's bank cards. Shirokova also noted that a woman named Aire Kupp was Shvartsovskiy's girlfriend and lived at 2278 West Street, Apartment 2nd Floor, Brooklyn, New York 11223. Shirokova stated that, to her knowledge, her brother, Aleksandr Kostin, was not involved in the arms trafficking conspiracy.

described below, Shvartsovskiy later referred Egorov to his "partner", ALEXANDRE ASTAKHOV, to purchase the devices.   The investigators believe that Shvartsovskiy, one of the ringleaders of this smuggling enterprise, used ASTAKHOV and others, such as Igor Bobel, to make the purchases on behalf of this criminal enterprise as a way of attempting to insulate himself from law enforcement scrutiny.

Between April and September 2012, Egorov, Shvartsovskiy, and ASTAKHOV engaged in a lengthy series of negotiations to purchase high tech military devices.   On September 12, 2012, ASTKAHOV traveled to Philadelphia, met with Egorov, and bought two L-3 CNVD-T thermal clip-on night vision devices and an OASYS SkeetIR thermal weapon sight for $43,000 in U.S. currency.   ASTAKHOV had previously provided Egorov with a $2000 down payment at a previous meeting.   ASTAKHOV intended to buy three L-3 mini thermal monoculars for $28,000 the following week.   Based upon statements made by ASTAKHOV to Egorov during the negotiations to purchase these devices, the government will prove beyond a reasonable doubt that ASTAKHOV and his co-conspirators intended to illegally export these devices.

**A.     April 6, 2012 at 5:50 p.m.**

On April 6, 2012, at 5:50 p.m., Denis Egorov called Shvartsovskiy who was using the alias "Steve Huni".   Egorov asked Shvartsovskiy, "have you decided with the order" of night vision devices which they had previously discussed.   Shvartsovskiy replied that he had "a few questions" for Egorov.   Shvartsovskiy asked, "Is it possible to get a photo of these items you have?"   Egorov replied, "Yes, what exactly are you interested in?   You're interested in two MTM [mini thermal monoculars] cameras, as I understand, and CNVD-T2?"   Shvartsovskiy responded, "Yes, at the moment, yes."   Egorov and Shvartsovskiy then discussed a transaction in

3

which Shvartsovskiy would pay cash for the devices. Not trusting each other, both parties expressed some hesitation about completing the deal without having met in person first. Shvartsovskiy asked Egorov to e-mail him the photos of the devices and they agreed to wait until then to decide whether or not to complete the deal.

**B.     April 18, 2012 at 6:05 p.m.**

On Wednesday, April 18, 2012, at 6:05 p.m., Shvartsovskiy's partner, ALEXANDRE ASTAKHOV called Egorov to set up a meeting for that Friday. Egorov then asked ASTAKHOV, "And I wanted to confirm, you only want two cameras for now, right? You won't be taking T2 [CNVD-T2] for now, am I correct?" ASTAKHOV replied, "No, not now." ASTAKHOV then explained, "Wait, we might need a T2 in about a week or so, will you have more in stock?" Egorov stated that he was not certain. ASTAKHOV and Egorov then agreed to talk again that Friday.

**C.     April 18, 2012 at 6:10 p.m.**

A few minutes later, Egorov called Shvartsovskiy to clarify the working relationship between ASTAKHOV and Shvartsovskiy. Egorov stated, "I wanted to clarify a small situation here, just don't want to be the guy who gets stuck in the middle. I got a call from your partner Alexander [ASTAKHOV] today." Shvartsovskiy replied, "Yes, yes, that's exactly right. I was away and I gave him the phone number, but I didn't warn you, but technically everything is fine and everything is in order. Did the two of you work things out?" Egorov answered, "Well, yes. We made plans for Friday. I wanted to make sure that I can sell him the devices that I put aside for you: the two cameras MTM [mini thermal monoculars] and he's going to think more about the T2 [CNVD-T2], he's supposed to call me back tomorrow. I'd hate to have a miscommunication

where I promised you." Shvartsovskiy interrupted, "No, no, there's no miscommunication. Everything is fine and in order. We work together. You make arrangements with him. He does the purchasing. Everything is fine."

### D. April 19, 2012 at 5:48 p.m.

The next day, Egorov called ASTAKHOV and postponed their meeting on Friday, telling him that he had a "last minute business trip".

### E. May 2, 2012 at 6:16 p.m.

In early May, Egorov spoke with Shvartsovskiy to further discuss meeting in person before completing their transaction. Shvartsovskiy indicated to Egorov that he did not want to meet in person and that Egorov should deal with ASTAKHOV. Shvartsovskiy stated, "Look, Alex [ASTAKHOV] is the one who handles these things more. He has done purchasing on my behalf, he has a good handle on this and knows about it." Shvartsovskiy further elaborated, "I don't mind a meeting, but the main person you'll be working with is him [ASTAKHOV]. He has a good handle on these things, and he had always done the purchasing on my behalf." Following the instructions of his HSI handlers, Egorov insisted on meeting Shvartsovskiy by stating, "We are talking big money, big devices, so I would like, I think it'll be safer for you and for me if we get introduced". Still reluctant to meet face-to-face, Shvartsovskiy told Egorov that he would call him back.

### F. May 31, 2012 at 4:16 p.m.

On May 31, 2012, Egorov called ASTAKHOV about setting up the meeting. ASTAKHOV agreed to meet with Egorov but stated that Shvartsovskiy, whom he referred to as "Steve", was very busy and would not meet with Egorov.

5

### G. June 4, 2012 at 6:50 p.m.

On June 1, 2012, Shvartsovskiy, using the "Steve Huni" e-mail account, e-mailed Egorov, explained that he had been out of the country, and stated that he was still interested in purchasing the CNVD-T3 device. On June 4, 2012, ASTAKHOV called Egorov and they agreed to meet on June 7, 2012 to discuss the purchase of the CNVD-T3 device.

### H. June 7, 2012 at 6:08 p.m.

On June 7, 2012, Egorov and ASTAKHOV met in the Eastern District of Pennsylvania to discuss a cash sale of night vision equipment. This meeting was consensually monitored and recorded by law enforcement agents. At the beginning of this recorded conversation, Egorov told ASTAKHOV that he only wanted to conduct large transactions. Egorov further told ASTAKHOV that he did not care where ASTAKHOV was sending the export-restricted night vision devices. Egorov stated that his only concern was that he did not want to get "framed". Egorov then asked ASTAKHOV if he would sign export compliance forms in which ASTAKHOV would certify that ASTAKHOV was aware that the items which Egorov sold to him could not be exported without a proper license. Egorov tried to hand ASTAKHOV a form to sign which ASTAKHOV refused to take. ASTAKHOV replied that he would not sign such a form, stating, "No, we don't work like that. We won't be signing papers."

Later in the conversation, Egorov asked ASTAKHOV what he intended to do with the devices. ASTAKHOV cryptically suggested that his role in the conspiracy was to purchase the export-restricted devices by stating, "Let's just say I only deal with you, the rest doesn't involve me." ASTAKHOV explained, "In other words, we try to cover our asses too". Egorov and ASTAKHOV then discussed the manner in which the devices would be exported. Egorov asked

6

ASTAKHOV to be careful and suggested that he remove the serial numbers from the export-restricted devices so they could not be traced back to Egorov. Egorov stated that ASTAKHOV could remove the serial numbers or Egorov could remove them for him prior to export. ASTAKHOV replied, "Whatever you prefer."

   **I.  June 14, 2012 at 4:18 p.m.**

After their meeting, Egorov called ASTAKHOV and told him that he could sell him the three night vision devices which ASTAKHOV wanted for $57,000. ASTAKHOV then asked, "How soon will you have them after I give you an ok?" Egorov replied that he needed "25 to 30 days." ASTAKHOV further inquired, "Will there be some sort of deposit?" Egorov responded, "I would want one. Yes, yes, yes, Alex. Because we are talking about serious devices that don't get sold every day." Egorov explained, "So I would want at least a five or a ten [percent down payment] up front."

   **J.  June 15, 2012 at 4:23 p.m.**

The next day, ASTAKHOV called Egorov to inquire about the specifics of the OASYS SkeetIR thermal weapon sight. Egorov replied that he believed it was "640 by 480".

   **K.  June 15, 2012 at 4:28 p.m.**

A few minutes later, ASTAKHOV called Egorov and indicated that those specifications were sufficient and that he wanted to purchase the OASYS SkeetIR thermal weapon sight. Egorov promised he would check the price for that device.

   **L.  June 15, 2012 at 4:30 p.m.**

ASTAKHOV called Egorov back to ask Egorov to send him the internet link for the

OASYS SkeetIR thermal weapon sight which he intended to sell to him.[2]

### M. June 28, 2012 at 4:30 p.m.

On June 28, ASTAKHOV called Egorov to tell him that he needed to purchase a CNVD-T and an OASYS. Egorov stated that he would check and call him back. ASTAKHOV asked if Egorov would accept a 5% deposit on the items to which Egorov agreed.

### N. June 28, 2012 at 6:05 p.m.

Egorov called ASTAKHOV back later that day to ask if ASTAKHOV would increase the size of his order to get a discount in price. ASTAKHOV stated that he needed some time to check on it.

### O. June 29, 2012 at 4:15 p.m.

The next day, Egorov called ASTAKHOV to see what he had decided. ASTAKHOV replied that he wanted to purchase a CNVD-T and an OASYS. Egorov noted that the order should be ready between July 16 and July 20.

### P. July 9, 2012 at 7:01 p.m.

On this date, Egorov called ASTAKHOV to tell him that he could not fill his prior order in the time period previously discussed. Egorov noted that it would be not ready until mid-August.

### Q. July 12, 2012 at 5:43 p.m.

On this date, Egorov called ASTAKHOV to pick and date and time to meet in person.

---

[2] On June 15, 2012, ASTAKHOV began to email Egorov from a newly created email account, alex.alex822@yahoo.com. Illustrating the level of sophistication of this group, ASTAKHOV used this e-mail account solely to communicate with Egorov about the cash purchase of night vision. A search of the internet protocol (IP) addresses used to access the account alex.alex822@yahoo.com also revealed that the account is being accessed by a user in Russia - most likely one of the ringleaders of this group. ASTAKHOV undoubtedly provided him with his username and password so that the ringleader could access ASTAKHOV's account.

They agreed to meet the following Tuesday, July 17.

### R. July 16, 2012 at 3:11 p.m.

The day before they were scheduled to meet, Egorov called ASTAKHOV to tell him that he was "booked" for tomorrow. They agreed to postpone the meeting until Thursday, July 19. Egorov asked ASTAKHOV if he was interested in purchasing some "MTMs" [mini thermal monoculars]. ASTAKHOV stated that he would "try to get him an answer".

### S. July 16, 2012 at 7:20 p.m.

ASTAKHOV called Egorov back that evening to tell him "about those three MTMs [mini thermal monoculars], we got a positive answer." Egorov replied, "Excellent. So we have two CNVD-Ts, one [OASYS] SkeetIR, and three MTMs." Egorov related, "If I'm not mistaken, it comes up to 71k [$71,000], right?" ASTAKHOV replied, "Yes" but noted that he only had "two" [$2000] for the deposit. Egorov agreed to accept the smaller deposit.

### T. July 19, 2012 at 7:05 p.m.

On July 19, 2012, ASTAKHOV and Egorov again met in the Eastern District of Pennsylvania to discuss the cash sale of three mini thermal monoculars (MTM), two CNVD-Ts, and one SkeetIR for $71,000. This meeting was consensually monitored and recorded by law enforcement agents. During that meeting, ASTAKHOV provided Egorov with a $2,000 deposit for the purchase. Egorov asked ASTAKHOV what precautions he was taking to ensure that he would not get caught exporting the night vision devices. ASTAKHOV replied, "You know I can't tell [you] all of this." ASTAKHOV explained, "I understand that you don't want to put yourself on the spot but understand that I have no reason to put my ass on the spot either. I mean, I can't tell you how, how it all works." Egorov implored ASTAKHOV to be careful and

9

understand the consequences of engaging in this conduct. ASTAKHOV replied, "I know what it is about."

**U.     August 2, 2012 at 4:45 p.m.**

On August 2, 2012, Egorov placed a recorded phone call to ASTAKHOV to discuss their relationship and to ensure that when ASTAKHOV exported the devices which Egorov sold to him, that ASTAKHOV would not get caught. Egorov reminded ASTAKHOV that illegally exporting these devices is "punishable with jail" and that "this is not a joke and these are not toys." Egorov further stated, "I want to be sure that the devices that you buy from me that they will leave the country safely, that they won't be held up somewhere like on the border, and that no one will trace them back to me, understand?" ASTAKHOV replied, "Listen, if I don`t tell you everything it doesn't mean that I don`t know what I`m doing, right?" Egorov suggested that they meet in person. ASTAKHOV replied, "Listen, let's do meet, because I don't want to talk about these things over the phone."

**V.     August 2, 2012 at 8:33 p.m.**

Later that evening, Egorov called ASTAKHOV back. They agreed to meet on Tuesday, August 7, 2012 in the evening.

**W.     August 7, 2012 at 8:04 p.m.**

On August 7, 2012, ASTAKHOV and Egorov met in a parking lot in Mount Laurel, New Jersey. During the meeting, Egorov expressed concern that he might be implicated if ASTAKHOV was caught illegally exporting these devices because the authorities would track the devices back to him. In response, ASTAKHOV stated, "But is it possible to remove the serial numbers somehow?" Egorov then explained the difficulty in removing all of the serial numbers.

10

ASTAKHOV noted that "everything is disassembled" before it is exported. Egorov asked if ASTAKHOV's people knew how to do this properly. ASTAKHOV replied that his people were not rookies, "We can put it this way - this is not the first year they do this." Egorov asked how the items are exported. ASTAKHOV replied, "not by mail." ASTAKHOV would not explicitly state how, but noted, "there are personnel who take care of it".[3]

Egorov then insisted that ASTAKHOV provide him with more detail of the illegal exportation conspiracy. Egorov asked ASTAKHOV if he could vouch for his co-conspirators who handled the illegal exportation. ASTAKHOV answered that this was not the first time they were doing it. Egorov then asked ASTAKHOV if he could guarantee that the night vision devices he would sell to him would leave the United States safely. ASTAKHOV replied, "Yes." Egorov pressed, "For sure?" ASTAKHOV insisted, "One hundred percent." ASTAKHOV explained, "I am telling you that I have absolutely no desire to expose myself either. Not for any amount of money."

Egorov then asked ASTAKHOV if he knew the penalties for illegally exporting arms. ASTAKHOV replied that he understood that the law was "three" [years in prison if convicted]. ASTAKHOV further stated that he understood that there was a "prohibition of export" for these devices. Egorov and ASTAKHOV then discussed a case where a woman was arrested at the airport for trying to illegally export these devices. Egorov related that he heard that this woman was sentenced to 10 years in jail for that offense. Later in the conversation, Egorov explained to ASTAKHOV, "this is very dangerous Alex . . . I am telling you that it is very serious. They can give you jail, jail time."

---

[3] The investigation revealed that some of the devices were being illegally exported by Aeroflot crew members.

At the end of the conversation, Egorov told ASTAKHOV that all the devices should arrive around August 24.

### X. August 31, 2012

On August 31, 2012, Egorov called ASTAKHOV and told him that there was a two week delay in receiving the shipment. ASTAKHOV confirmed that he wanted the OASYS, MTMs, and CNVD-T devices.

### Y. September 6, 2012

On September 6, 2012, Egorov called ASTAKHOV to inquire if he wanted to add more devices to his order. ASTAKHOV replied, "Actually, there are things I could add, but I just don't want to do that until we're done making moves, I just can't proceed until then. Let me at least pick up something from you first."

### Z. September 6, 2012

On September 6, 2012, Egorov made arrangements with ASTAKHOV to meet him on September 11, 2012 in Philadelphia to sell him a portion of ASTAKHOV's order: two L-3 CNVD-Ts and one OASYS SkeetIR thermal weapon sight in exchange for $41,000.

### AA. September 10, 2012

On September 10, 2012, ASTAKHOV called Egorov and told him that he needed an extra day to get the money together and they pushed the deal back one day.

### BB. September 12, 2012 at 8:04 p.m.

On September 12, 2012, Egorov met with ASTAKHOV in the parking lot of a Home Depot store on Columbus Boulevard in Philadelphia. ASTAKHOV handed Egorov a bag containing approximately $41,000 in U.S. currency. Egorov asked ASTAKHOV if all the money

was in the bag. ASTAKHOV replied that he did not count it - implying that someone else had given him the bag of money. Egorov then handed ASTAKHOV two L-3 CNVD-Ts and one OASYS SkeetIR thermal weapon sight which ASTAKHOV intended to illegally export. Egorov and ASTAKHOV agreed to meet the following week to exchange the three mini thermal monocular devices in exchange for an additional $28,000.

After the exchange, law enforcement officers placed ASTAKHOV under arrest. ASTAKHOV waived his Miranda rights and agreed to speak with the investigators. ASTAKHOV admitted that he knew it was illegal to export night vision devices such as the ones he purchased unless he had a license to do so.

The United States Department of State has confirmed that neither Shvartsovskiy nor ASTAKHOV has never applied for, nor received, an export license or written approval to legally export the L-3 mini thermal monoculars (MTM), L-3 CNVD-Ts, and OASYS SkeetIR. The United States Department of State, Directorate of Defense Controls, has also confirmed that the L-3 CNVD-T, L-3 MTM, and the OASYS SkeetIR are defense articles in category XII(c) on the United States Munitions List. Accordingly, all require a license to legally export.

### III. Elements of the Offenses

The defendant Alexandre Astakhov is charged in the indictment with committing the offense of conspiracy to violate the Arms Export Control Act. This offense has four essential elements, which are:

First: Two or more persons agreed to commit an offense against the United States, as charged in the indictment;

Second: The defendant was a member or party to that agreement;

13

| | |
|---|---|
| Third: | The defendant joined the agreement or conspiracy knowing of its objective to commit an offense against the United States and intending to join together with at least one other alleged conspirator to achieve that objective; that is, that the defendant and at least one other alleged conspirator shared a unity of purpose and the intent to achieve a common goal or objective, to commit an offense against the United States; and |
| Fourth: | At some time during the existence of the agreement or conspiracy, at least one of its members performed an overt act in order to further the objectives of the agreement. |

Alexandre Astakhov is also charged with committing the offense of attempted violation of the Arms Export Control Act. The elements of that offense are:

| | |
|---|---|
| First: | The defendant willfully attempted to export from the United States; |
| Second: | A defense article designated by the President on the United States Munitions List; |
| Third: | Without a license. |

As an alternate theory of proof, the defendant may be convicted for aiding and abetting some other person's attempt to violate the Arms Export Control Act under 18 U.S.C. § 2. In order meet its burden under this theory, the government must prove that:

First: That someone else committed or attempted to commit the offense charged by committing each of the elements of the offense charged, as I have explained those elements to you in these instructions. This other person need not have been charged with or found guilty of the offense, however, as long as you find that the government proved beyond a reasonable doubt that

he committed the offense or attempted to commit that offense.

Second: That ASTAKHOV knew that the offense charged was going to be committed or was being committed by some other person, and

Third: That ASTAKHOV knowingly did some act for the purpose of aiding or assisting some other person in committing the specific offense charged and with the intent that this other person commit that specific offense, and

Fourth: That ASTAKHOV's acts did, in some way, aid, assist, or facilitate, this other person to commit the offense or attempt to commit the offense. ASTAKHOV's acts need not themselves be against the law.

## IV. Witnesses

### 1. Ruth Jackson

Ruth Jackson is the Licensing Division Chief within the Department of State, Directorate of Defense Trade Controls ("DDTC"), Office of Defense Trade Controls Licensing. She will explain the process at DDTC if an individual wanted to seek a license to export these devices. While the State Department certifications for this case are self-authenticating documents and admissible under Rule 803(7) of the Federal Rules of Evidence, she will also explain the process which DDTC employs to determine that a device is on the United States Munitions List (USML) and certify that the defendant and his co-conspirators have not received a license to legally export these devices. She will also note the role that the Department of Defense, Defense Technology Security Administration (DTSA), in providing technological guidance to the DDTC.

### 2. Ellen Rogers

Ellen Rogers is a senior scientist with the Department of Defense, Defense Technology

Security Administration (DTSA). Ms. Rogers is responsible for, inter alia, the technical analysis of export licenses which assist DDTC to determine whether a particular device is covered by the USML. She will testify she reviewed the technical specifications for the devices and determined that the three items referenced in this indictment, (namely the L-3 Mini Thermal Monocular, CNVD-T, and SkeetIR thermal monocular) are covered by the USML.

### 3. Tatiana Hay

Tatiana Hay is a professional Russian translator. She will testify that the transcripts of the audio conversations between Egorov and ASTAKHOV and the translations of the text and Skype messages in Russian found on ASTAKHOV's phone and true and correct.

### 4. Yahor Osin

As noted above, Osin is the cooperating defendant who sold the devices to ASTAKHOV which he intended to illegally export. Osin will describe his dealings with ASTAKHOV and "Steve" through the e-mails, text messages, and recorded conversations. During his testimony, the government intends to read the translated conversations with the assistance of two readers.

### 5. Special Agent Alex Zuchman

Special Agent Zuchman is the case agent. He will describe the investigation. He will introduce various photographs of ASTAKHOV, money seized, and the devices. He will also introduce e-mails seized during the course of his investigation. He will introduce various summary charts relating to the devices purchases and the IP addresses used as part of this conspiracy. He will introduce evidence seized from ASTAKHOV at the time of his arrest, including text messages and Skype messages. Finally, he will introduce statements made by ASTAKHOV after his arrest.

### 6. Special Agent Rebecca Lafferty (May Call)

Special Agent Lafferty or another HSI special agent will testify only if necessary regarding the surveillance of ASTAKHOV during the meetings with Osin and the seizure of the $41,000 in currency on September 12, 2012.

### 7. Svetlana Shirokova (May Call)

Shirokova will be called only if necessary. She is the sister of Alexander Kostin. "Steve" used Kostin name, bank account records, mailing address, and e-mail address as part of the conspiracy. Shirokova would testify that Kostin came to the United States for a short period of time and returned to Russia in 2011. When Kostin returned to Russia, he gave some of his personal documents, including his bank card, to Yakov Shvartsovskiy, a/k/a "Steve". Shirokova will identify Shvartsovskiy as a friend of Kostin. Shirokova will also identify Aire Kupp as Shvartsovskiy's girlfriend who resides at 2278 West Street, 2nd Floor, Brooklyn, the address where Shvartsovskiy ordered night vision devices to be delivered. Shirokova would testify that, to her knowledge, Kostin was not involved in smuggling night vision devices.

## V. Conclusion

At the conclusion of this case, the government will ask the jury to find ALEXANDRE ASTAKHOV guilty of the two count charged in the indictment. The government's evidence in support of such a finding is overwhelming.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney

/s/
ROBERT J. LIVERMORE
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the Government's Trial Brief has been served filing upon:

        Jim Pascarella, Esq.
        Counsel for ALEXANDRE ASTAKHOV

                              /s/
                            Robert J. Livermore
                            Assistant United States Attorney